**IN THE UNITED STATES BANKRUPTCY COURT FOR
THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| IN RE: | CASE NO. 11-07018 (EAG) |
| EMPRESAS MARTINEZ VALENTIN CORP., | |
| DEBTOR. | |
| EMPRESAS MARTINEZ VALENTIN CORP., | ADVERSARY NO. 11-00178 (EAG) |
| PLAINTIFF, | |
| v. | |
| PC PUERTO RICO LLC, | |
| DEFENDANT. | FILED & ENTERED ON 04/04/2017 |

**OPINION AND ORDER**

**I. Procedural History.**

Empresas Martínez Valentín Corp. ("Empresas Martínez," "debtor," or "plaintiff") is a Puerto Rico corporation that owns real property in Sabana Grande, Puerto Rico, containing a gasoline service station. The property was subject to a long-term lease agreement entered into by the prior owner with Texaco Puerto Rico, Inc., which has since changed its name to PC Puerto Rico, LLC ("PC Puerto Rico").[1]

---

[1] During the relevant period, the defendant has also been known as Texaco Puerto Rico, LLC and Chevron of Puerto Rico, LLC. (Adv. Dkt. No. 50.) For the sake of consistency, the court will refer to the defendant as "PC Puerto Rico" throughout this opinion and order.

On August 19, 2011, Empresas Martínez filed a petition for relief under chapter 11 of the Bankruptcy Code. (Bankr. Dkt. No. 1.) Shortly thereafter, on August 31, 2011, the debtor filed this adversary proceeding against PC Puerto Rico. (Adv. Dkt. No. 1.) PC Puerto Rico had brought a separate lawsuit in district court in 2010 against the debtor's president, who was operating the gasoline station. Empresas Martínez asserts in this adversary that PC Puerto Rico was using the district court lawsuit to infringe upon its rights as the owner of the Sabana Grande property. Id. The adversary complaint included causes of action for violation of the automatic stay as well as a number of other counts. (Adv. Dkt. No. 1.) PC Puerto Rico filed its answer on September 30, 2011. (Adv. Dkt. No. 6.)

After a series of procedural delays, this court partially granted PC Puerto Rico's motion for summary judgment, dismissing one of the causes of action. (Adv. Dkt. No. 176.) At a hearing held August 13, 2015, the court was informed–for the first time–that the "real property was sold in the summer of 2014, and that the premises other than the gas station and convenience store was already given back to debtor." (Adv. Dkt. No. 212.) These developments rendered moot a number of the counts and allegations in the original complaint. As a result, the plaintiff was given a term to file an amended complaint to strike the counts that were no longer relevant. Id. On September 22, 2015, the plaintiff filed an amended complaint with four causes of action. (Adv. Dkt. No. 218.) PC Puerto Rico moved to strike a cause of action for breach of contract, which the court granted, leaving causes of action for willful violation of stay against a corporate debtor under section 105(a), as well as counts for loss of

income, and loss of future income/loss of value as a going concern.[2]  (Adv. Dkt. Nos. 219 &

240.)  A trial date was set for December 2015.  (Adv. Dkt. No. 240.)

The trial was held on December 7 through December 9, 2015, February 22 through

February 23, 2016, and March 14, 2016.  (Adv. Dkt. Nos. 266, 267, 268, 270, 280, 281, 282, 285

& 286.)  The court heard testimony from Angel Martínez Valentín, debtor's president; José

Roberto Pérez, an appraiser; Myriam Berríos Hernández, a former business consultant for PC

Puerto Rico who testified via closed-circuit simultaneous transmission; and José Luis Faure

Castro, the former district manager for PC Puerto Rico's retail business on the island.  The

court also heard testimony from plaintiff's expert witness, Armando Avilés Gallosa.  At the

conclusion of the six-day trial, the parties were given a term to file post-trial briefs.  The matter

was then taken under advisement.  (Adv. Dkt. No. 286.)  In addition, both parties have filed

several related motions that will be addressed herein.  (Adv. Dkt. Nos. 284, 289, 290 & 291.)

Missing Witness Rule

The first such motion has to do with the missing witness rule.  At the close of trial, the

plaintiff moved the court to make an adverse inference against PC Puerto Rico due to the

defendant's decision not to call two of its witnesses listed in the second amended pretrial

report (the "pretrial report"). Empresas Martínez later supplemented that request in writing,

---

[2]Unless otherwise indicated, the terms "Bankruptcy Code," "section" and "§" refer to Title 11of the
United States Code, 11 U.S.C. §§101-1532, as amended.  All references to "Bankruptcy Rule"are to the
Federal Rules of Bankruptcy Procedure, and all references to "Rule"are to the Federal Rules of Civil
Procedure.  All references to "Local Bankruptcy Rule"are to the Local Bankruptcy Rules of the United
States Bankruptcy Court for the District of Puerto Rico.  All references to "Local Civil Rule"are to the
Local Rules of Civil Practice of the United States District Court for the District of Puerto Rico.  And all
references to "FRE" are to the Federal Rules of Evidence.

and the defendant opposed.  (Adv. Dkt. Nos. 289 & 293.)  The court declines to draw such a inference.

Generally, when "a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." Graves v. United States, 150 U.S. 118, 121, 14 S. Ct. 40, 37 L. Ed. 1021 (1893).  A witness is unavailable to one party in a litigation where "the witness is physically available only to the opponent or . . . the witness has the type of relationship with the opposing party that practically renders his testimony unavailable to the moving party." Ranish v. Delta Air Lines, 1995 U.S. App. LEXIS 39834, at *7 (2d Cir. Nov. 21, 1995) (quoting Oxman v. WLS-TV, 12 F.3d 652, 661 (7th Cir. 1993)).  The "missing witness rule," as it is often referred to, is "inapplicable unless the information possessed by the absent witness is both material, that is relevant to the case, and non-cumulative." Bohm v. Horsley Co. (In re Groggel), 333 B.R. 261, 304 (Bankr. W.D. Pa. 2005).  The party seeking the inference bears the burden of proof. Adelson v. Hananel, 641 F. Supp. 2d 65, 77n.3 (D. Mass. 2009).

Here, the court finds that the plaintiff did not meet its burden.  The pretrial report states that Milton Delgado, a former credit division manager of Chevron Puerto Rico, LLC, was set to testify "amongst other things, about the breaches of the franchise agreement which occurred and which made the filing of the federal action necessary," and that Carmen Centeno, a credit and collections supervisor for PC Puerto Rico, would testify "amongst other things, about issues related to the historic performance and profitability of the subject station during the past 5 years."  (Adv. Dkt. No. 209 at pp. 17-18.)

As an initial matter, Empresas Martínez has not shown that the witnesses were unavailable. The plaintiff did not subpoena either witness, nor were the witnesses even deposed. Further, the record does not demonstrate that either witness enjoys such a close relationship with PC Puerto Rico as to render that witness "unavailable." See Kalisch v. Maple Trade Fin. Co., (In re Kalisch), 413 B.R. 115, 132 (Bankr. S.D.N.Y. 2008) ("Where physical availability is not an issue, a court may find that a relationship between a party and a witness renders that witness 'unavailable.' This is true where the court draws a reasonable inference that the witness would naturally give testimony that favors one party because of that relationship.").

Even if the court were to find, for the sake of argument, that Ms. Centeno, as a current employee of PC Puerto Rico, did have such a close relationship with her employer as to deem her an "unavailable witness," her testimony does not appear to be relevant to this case. The profitability of the supermarket is the issue here, not the profitability of the service station. Given that the supermarket's sales were kept separate from the gasoline business, and that the supermarket sales numbers were not turned over to the defendant, the court finds that Ms. Centeno's testimony on this issue would not be relevant. (Adv. Dkt. No. 314-6 at p. 41, p. 107 at ln. 19 to 22.) Likewise, Mr. Delgado's testimony about "breaches of the franchise agreement which occurred and which made the filing of the federal action necessary," is not relevant here. Several times throughout the proceedings, this court warned the parties not to use the forum of the bankruptcy court to re-litigate the district court case. PC Puerto Rico's decision not to call these two witnesses is in line with that warning.

In view of the above, the court draws no inference, negative or otherwise, from the defendant's decision not to call these witnesses. Plaintiff's motion at docket number 289 is denied.

## II. Jurisdiction.

This court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a), Local Civil Rule 83K(a), and the General Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of Puerto Rico, dated July 19, 1984 (Torruella, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## III. Findings of Fact.

After careful consideration of the witnesses' testimonies and the contents of the documents introduced as evidence, the court makes the following findings of fact and conclusions of law pursuant to Rule 52(a), made applicable to this proceeding by Bankruptcy Rule 7052:[3]

The Lease Agreement

In March 2006, Empresas Martínez purchased real property in Sabana Grande, Puerto Rico, that contained a gasoline service station. (Joint Ex. II, Adv. Dkt. No. 270-24.) The property was subject to a 2001 lease between the prior owner and PC Puerto Rico. (Joint Ex. I, Adv. Dkt. No. 270-31.) The 2001 lease included the following description of the property:

> RURAL: Parcel lot in Rayo Ward in Sabana Grande, consisting of zero point seventy-one cuerda (.71c), equivalent to twenty-seven (27) ares, ninety (90) centiares, and five hundred eighty-four (584) miliares; its boundaries are: to the NORTH, State Highway Number Two (2), kilometer two hundred fourteen

---

[3] The court also uses as guidance the proposed findings of fact and conclusions of law the parties submitted in their post-trial memoranda. (Adv. Dkt. Nos. 311, 315 & 322.)

(214), hectometer five (5); to the SOUTH with Vicente Quilichini; to the EAST, with land belonging to the Municipality of Sabana Grande; and to the WEST, with Josefa García widow of Arroyo.  It has a one-story cement building used as a gasoline service station, with pumps, car lifts, oil station and other equipment. Adjacent to it there is a cement and block dwelling measuring forty (40) feet along the front by twenty (20) feet deep.

(Joint Ex. I, Adv. Dkt. No. 270-31 at pp. 30-31.)

The 2001 lease, which had an initial term of 15 years, provides in pertinent part that:

THE LESSORS hereby lease to the LESSEE the property described above, but more specifically the area devoted to the gasoline service station included in the property described … above, with all the appurtenances and all the rights, titles and interest of THE LESSORS, including the corresponding access roads. As long as the rest of the property remains undivided, this lease affects the entire property[.]

(Joint Ex. I, Adv. Dkt. No. 270-31 at p. 36.)  José Luis Faure Castro, a former district manager for PC Puerto Rico's local retail business, testified that the "but more specifically" clause contained in the lease is very common in these types of leases and was typically included in the event that if a property were segregated in the future, such as through a partial expropriation, then the lease would continue to apply to the portion of the property with the gasoline service station.  (Adv. Dkt. No. 312-6 at pp. 22-23, p. 22 at ln. 6 to p. 23 at ln. 14.)  He also stated that PC Puerto Rico viewed it as a requirement that a lease apply to the whole property in order to register a first lien on the property.  (Adv. Dkt. No. 312-6 at p. 21, p. 21 at ln. 20 to ln. 24.)  The court accepts the testimony of Mr. Faure as a statement of PC Puerto Rico's company policy, without making a finding as to the contracting parties' specific understanding of the lease agreement in this particular case.[4]

---

[4]/The prior owner, Hilario Ayala, passed away following the sale of the property, and no admissible evidence was submitted by either party as to his understanding of the lease terms.

<u>The Renovations</u>

The debtor's president, Mr. Martínez, testified at length about the changes the property underwent after Empresas Martínez purchased it in 2006 through August 2011.  During his testimony, he also completed a series of drawings illustrating those changes, which were submitted as exhibits.  (Pl. Exs. I - M, Adv. Dkt. Nos. 270-11 to 270-15.)  With a few exceptions noted below, the court accepts Mr. Martínez' testimony on these matters, finding him to be credible.  Mr. Martínez' testimony regarding the renovations is supported by photographs taken of the property in 2008 and 2009 by an appraiser, which demonstrate the significant remodeling underway at the property during that time, both inside and out, including the addition of a new parking lot.  (Pl. Ex. B, Adv. Dkt. Nos. 270-7 & 270-8; Pl. Ex. C, Adv. Dkt. Nos. 270-9 & 270-10.)  Among other things, the photographs show that at least by March 2008, a large sign for the supermarket had been added to the building's exterior.  (Pl. Ex. B, Adv. Dkt. No. 270-7 at p. 19.)

Per Mr. Martínez, at the time Empresas Martínez purchased the property in 2006, the station contained four fuel pumps, a car port, and a building housing a caged cashier booth to handle fuel sales as well as five commercial spaces, three of which were empty.  (Adv. Dkt. No. 314-1 at pp. 58-61, p. 59 at ln. 4 to p. 62 at ln. 16; Pl. Ex. I, Adv. Dkt. No. 270-11.)  Mr. Martínez estimated that the room containing the cashier booth was approximately 400 to 500 square feet.  (Adv. Dkt. No. 314-1at p. 61, p. 62 at ln. 21 to ln. 24.)  The commercial tenants paid rent to Empresas Martínez.  (Adv. Dkt. No. 314-1 at p. 66, p. 67 at ln. 11 to ln. 15.)  At that time, the property was on the brink of foreclosure and was selling neither gasoline nor any other merchandise.  (Adv. Dkt. No. 314-1 at p. 54, p. 55 at ln. 5 to ln. 9.)

8

Seeking to take advantage of the property's central location in town and the fact that there was only one chain supermarket nearby, Mr. Martínez decided to convert the commercial space in the building into a supermarket, which he called Supermarket Tabonuco. (Adv. Dkt. No. 314-1 at pp. 68-69; p. 69 at ln. 18 to p. 70 at ln. 8.) Empresas Martínez began extensive renovations to the property after securing financing first from Cooperativa Sabana Grande in the amount of $1.5 million, and subsequently from Banco Popular de Puerto Rico in the amount of $2.25 million. (Adv. Dkt. No. 314-1 at p. 68, p. 69 at ln. 8 to ln. 17.) By 2008, after rearranging the other commercial spaces in the building that were being leased to third parties and making other structural and cosmetic changes, including adding a separate entrance and external signage, there was an approximately 2,500-square-foot space that could be dedicated to the supermarket. (Adv. Dkt. No. 314-1 at pp. 65-67, p. 66 at ln. 18 to p. 68 at ln. 12.) Mr. Martínez testified in great detail about how he expanded the number of display racks and refrigerator space, and listed the wide variety of products the market carried, including frozen meats, seafood, fruits and vegetables, as well as alcohol. (Adv. Dkt. No. 314-2 at pp. 48-58, p. 128 at ln. 16 to p. 138 at ln. 5; Pl. Ex. K, Adv. Dkt. No. 270-13.) He stated that the market also had a separate cash register, apart from the cashier booth that handled gasoline sales. (Adv. Dkt. No. 314-2 at pp. 58-59, p. 138 at ln. 6 to p. 139 at ln. 6.) In fact, during all of the renovations, Mr. Martínez testified that no changes were made to the cashier booth, as it contained specialized equipment that would need to be re-configured, which would be a significant undertaking. (Adv. Dkt. No. 314-2 at pp. 75-76, p. 155 at ln. 13 to p. 156 at ln. 4.) Mr. Martínez testified that the service station and the supermarket operated around the clock. (Adv. Dkt. No. 314-4 pp. 26-27, p. 109 at ln. 22 to p. 110 at ln. 1.) To that point, Mr.

Faure testified that gasoline service stations are exempt from the Puerto Rico closing laws, and typically remain open 24 hours a day, seven days a week. (Adv. Dkt. No. 312-6 at pp. 26-27, p. 26 at ln. 23 to p. 27 at ln. 16.)

The remodeling continued, and by the end of 2009 and beginning of 2010, Mr. Martínez testified that the available area that could be dedicated to the supermarket had tripled in size to approximately 7,200 square feet. (Adv. Dkt. No. 314-2 at p. 59, p. 139 at ln. 9 to ln. 14.) Mr. Martínez estimated that the supermarket was only operating at approximately 30% of this space, or between 2,400 to 2,600 square feet. (Adv. Dkt. No. 314-3 at p. 47, p. 46 at ln. 13 to ln. 25.)

PC Puerto Rico was aware of the extensive renovations taking place at the property. Ms. Berríos, who served as a business consultant to PC Puerto Rico during the relevant period and was tasked with supervising the Sabana Grande station, testified that she regularly visited gas station retailers to examine their sales, inspect the stations, and reconcile their books. (Adv. Dkt. No. 314-5 at pp. 13-14, p. 13 at ln. 21 to p. 14 at ln. 14.) The court found her testimony to be very credible. She stated that she would spend approximately an hour at the station each visit. (Adv. Dkt. No. 314-6 at p. 34, p. 100 at ln. 9 to ln. 13.) She would report her findings to her supervisor, the last of whom was Mr. Faure. (Adv. Dkt. No. 314-5 at pp. 59-60, p. 60 at ln. 25 to p. 61 at ln. 11.) She estimated that she visited the Sabana Grande station once every week or fifteen days. (Adv. Dkt No. 314-5 at pp. 28-29, p. 29 at ln. 13 to p. 30 at ln. 3.) On cross examination, Ms. Berríos admitted that from 2006 through 2011, she saw the market, which was originally just a gas station convenience store, transformed into a full-fledged supermarket. (Adv. Dkt. No. 314-6 at p. 35, p. 101 at ln. 7 to ln. 16.) And that there was now

10

significant square footage dedicated to the supermarket. (Adv. Dkt. No. 314-6 at p. 38, p. 104 at ln. 14 to ln. 19.) Ms. Berríos also confirmed in cross that the supermarket did not pay rent to PC Puerto Rico. (Adv. Dkt. No. 314-6 at p. 41, p. 107 at ln. 19 to ln. 22.) Furthermore, she revealed that PC Puerto Rico knew that there were third party tenants and that they were not paying rent to PC Puerto Rico. (Adv. Dkt. No. 314-6 at p. 38, p. 104 at ln. 2 to ln. 5.)

Sublease Agreement

In March 2009, PC Puerto Rico entered into an agreement to sublease the property to Mr. Martínez to operate the gasoline service station, selling Texaco-branded gasoline products. (Joint Ex. III, Adv. Dkt. No. 270-25.) As explained by Mr. Faure, this is a fairly common arrangement since, under Puerto Rico law, gasoline wholesalers are prohibited from operating service stations, and must do so through third parties. (Adv. Dkt. No. 312-6 at pp. 10-11, p. 10 at ln. 19 to p. 11 at ln. 3.) A common configuration, referred to in the industry as a "RORO," is where a station is retailer owned, retailer operated, meaning in this case that Empresas Martínez, which owned the station, leased it to the gasoline wholesaler PC Puerto Rico, which in turn subleased it to the retailer, Mr. Martínez, in his individual capacity. (Adv. Dkt. No. 312-6 at p. 11, p. 11 at ln. 7 to ln. 14.)

Among other things, the sublease agreement provided that, unless previously authorized by PC Puerto Rico in writing, the property was to be used solely for the operation of the gasoline service station and a convenience store, commonly referred to as a "C-store." (Joint Ex. III, Adv. Dkt. No. 270-25 at p. 25.) The agreement defines "convenience store" to mean:

> a grocery store of the type commonly known as a quick shop store or convenience store, which specializes in a limited line of high volume foods,

11

beverages and miscellaneous articles and which emphasizes a quick service to the clients that purchase a limited number of articles.

(Joint Ex. III, Adv. Dkt. No. 270-25 at p. 24.)

As relevant here, the sublease agreement also provided that Mr. Martínez would not "add any structure, nor . . . make any alteration, modification or improvement" to the property without PC Puerto Rico's prior written consent, nor would he add any signs to the property. (Joint Ex. III, Adv. Dkt. No. 270-25 at pp. 35-36.) Further, the agreement prohibited Mr. Martínez from engaging in a number of activities without PC Puerto Rico's prior written consent, including the sale of alcoholic beverages other than beer and wine sold in closed containers. (Joint Ex. III, Adv. Dkt. No. 270-25 at p. 27.)

District Court Litigation

On March 3, 2010, PC Puerto Rico filed a lawsuit against Mr. Martínez in Puerto Rico district court, alleging that he had violated the sublease agreement by failing to pay rent or pay for Texaco-branded petroleum products. See Dist. of Puerto Rico, Civil Case No. 10-1192. The suit brought a number of causes of action, including breach of contract and trademark infringement. Id. On January 13, 2011, the district court judge entered a preliminary injunction, ordering Mr. Martínez to "immediately surrender to [PC Puerto Rico] the Station, including its underground storage tanks and equipment . . . [and to] refrain from using the Texaco marks." (Def. Ex. 2, Adv. Dkt. No. 286-2 at p. 14.) Mr. Martínez did not comply, and on July 26, 2011, the district court entered an order for civil contempt, directing Mr. Martínez to:

vacate the premises in question and turn over the possession of the premises to Chevron on or before July 28, 2011 before 3:00 p.m. Otherwise, an order for his arrest for civil contempt will issue and he will be incarcerated until he complies with the lawful orders of this Court.

12

(Def. Ex. 3, Adv. Dkt. No. 286-3.) Mr. Martínez, in his individual capacity, filed a petition for relief under chapter 11 of the Bankruptcy Code on July 28, 2011.[5] See In re Ángel J. Martínez Valentín, Bankr. Case No. 11-6321. The next day, the district court entered an order stating that while the filing of a bankruptcy petition "may stay the collection of any money owned to [PC Puerto Rico], it does not stay an order to turn over possession of the property in question to [PC Puerto Rico], which was issued over six months prior to [Mr. Martínez'] bankruptcy filing." (Def. Ex. 4, Adv. Dkt. No. 286-4.)

Mr. Martínez again did not comply, and on August 2, 2011, the district court entered an eviction order, directing Mr. Martínez to, among other things, immediately surrender to PC Puerto Rico "the gasoline station, including its underground storage tanks and equipment." (Pl. Ex. R, Adv. Dkt. No. 270-20 at p. 4.) In so doing, the court acknowledged that Mr. Martínez had filed for bankruptcy, but stated that this would not forestall the eviction since PC Puerto Rico had "effectively exercised its rights to terminate the lease agreement prior to [Mr. Martínez] filing his bankruptcy petition on July 28, 2011." Id.

Per Mr. Martínez' testimony, on August 4, 2011, United States marshals, accompanied by a representative and attorney for PC Puerto Rico, served Mr. Martínez with the eviction order. (Adv. Dkt. No. 314-3 at p. 36, p. 37 at ln. 4 to ln. 25.) They then proceeded to change the locks on the supermarket and other commercial spaces, and to close the gasoline pumps by

---

[5]/The court takes judicial notice of the fact that a chapter 11 plan was later confirmed in this case (Bankr. Case No. 11-06321, Bankr. Dkt. Nos. 79, 90, 112 & 118), but the case was dismissed in April 2016 on a motion by the IRS. (Id. at Bankr. Dkt. Nos. 193 & 199.) Sabana Grande Texaco Corp., an entity whose stated purpose was the administration of the gasoline station from 2006 through 2010, filed a petition under chapter 7 of the Bankruptcy Code on July 18, 2011. (Bankr. Case No. 11-06096, Bankr. Dkt. Nos. 1 & 12 at p. 27.) On March 4, 2013, the chapter 7 trustee entered a report of no distribution, and the case was closed on May 28, 2013. (Id., Bankr. Dkt. Nos. 26 & 30.)

surrounding them with chained drums filled with cement. (Adv. Dkt. No. 314-3 at pp. 34-35, p. 35 at ln. 19 to p. 36 at ln. 19.) At that point, the supermarket ceased operations. (Adv. Dkt. No. 314-2 at p. 71, p. 151 at ln. 20 to ln. 25.) Mr. Martínez testified that the marshals also changed the locks on the commercial spaces being rented to third parties. (Adv. Dkt. No. 314-3 at p. 34, p. 35 at ln.19 to ln. 24.) Mr. Martínez stated that the marshals did not give him a choice, that he had to hand over the entire property or he would be arrested. (Adv. Dkt. No. 314-3 at p. 38, p. 39 at ln. 4 to ln. 12.) Nevertheless, Mr. Martínez testified and illustrated that in order to enclose only the cashier booth, leaving the supermarket operable, it would have required constructing three gypsum walls surrounding the cashier cage, which would have taken less than three days to complete, and would have cost approximately $1,750.00. (Adv. Dkt. No. 314-3 at pp. 7-11, p. 8 at ln. 4 to p. 12 at ln.17; Pl. Ex. O, Adv. Dkt. No. 270-17.) The court finds this testimony also to be credible.

On August 19, 2011, Empresas Martínez, the owner of the real property, filed the bankruptcy case of caption under chapter 11 of the Bankruptcy Code. (Bankr. Dkt. No. 1.) PC Puerto Rico first appeared in the case on August 23, 2011. (Bankr. Dkt. No. 6.)

Meanwhile, at a hearing held in the district court case on September 23, 2011, PC Puerto Rico informed the court that Mr. Martínez continued to enter the property and was not complying with the preliminary injunction. (Pl. Ex. W, Adv. Dkt. No. 270-21 at p. 13.) In response, the district court ordered that all movable property be removed before September 27, 2011 at 4:00p.m., and that the "remaining property will be disposed of after said deadline. Arrangements to be made between lawyers." Id. While it is not clear from the record what reason, if any, Mr. Martínez provided the district court for his returning to the property, Mr.

14

Martínez testified during this trial that he continued to go to the property to get materials for a separate metal shop business that he ran at the property. (Adv. Dkt. No. 314-3 at p. 39, p. 40 at ln. 9 to ln. 20.)

Mr. Martínez testified that he attempted to comply with the court's order, but was unable to move everything in time due, in part, to extenuating circumstances. (Adv. Dkt. No. 314-3 at pp. 41-42, p. 41-A at ln. 26 to p. 41-B at ln. 22.) Specifically, he stated that he was unable to move the equipment or inventory from the supermarket, including the refrigerators and display cases. (Adv. Dkt. No. 314-3 at p. 46, p.45 at ln. 16 to ln. 23.) After the deadline expired, Ms. Berríos confirmed that a maintenance company hired by PC Puerto Rico disposed of the remaining equipment and inventory. (Adv. Dkt. No. 314-6 at pp. 32-33, p. 98 at ln. 12 to p. 99 at ln. 10.) Mr. Martínez testified that no one from PC Puerto Rico contacted him again to coordinate the removal of any remaining items related to the supermarket. (Adv. Dkt. No. 314-3 at p. 39, p. 40 at ln. 1 to ln. 5.) Ms. Berríos confirmed that she had no contact with Mr. Martínez following that date, and that, in any event, company policy was for all communications to go through the maintenance company hired by PC Puerto Rico. (Adv. Dkt. No. 314-5 at p. 38, p. 39 at ln. 13 to ln. 20.)

### IV. Legal Discussion.

The amended complaint asserts causes of action for willful violation of the automatic stay stemming from PC Puerto Rico's closure of the supermarket and the disposal of the equipment and inventory, as well as related counts for loss of income, and loss of future

income/loss of value as a going concern.[6] (Adv. Dkt. No. 218.) The court finds that PC Puerto Rico, by disposing of the debtor's equipment and inventory, violated the automatic stay.

The filing of the bankruptcy petition triggers an automatic stay of, among other things, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Individual debtors injured by a willful violation of the stay may recover under section 362(k). 11 U.S.C. § 362(k). However, the First Circuit has joined with other circuits in holding that non-individual debtors, including corporations, may only recover for stay violations under the contempt powers of the bankruptcy court through section 105(a). See In re El Comandante Mgmt. Co., LLC, 358 B.R. 1, 11 (Bankr. D.P.R. 2006) ("A debtor corporation may request that an entity be held in contempt of court for violation of the automatic stay under the contempt power of the court, pursuant to section 105(a) of the Bankruptcy Code.") (citing Spookyworld, Inc. v. Town of Berlin (In re Spookyworld, Inc.), 346 F.3d 1 (1st Cir. 2003)).

In order to prevail, a party requesting contempt sanctions must show, by clear and convincing evidence, that the other party violated an order of the court. See AccuSoft Corp. v. Palo, 237 F.3d 31, 47 (1st Cir. 2001) (citation omitted). The automatic stay injunction qualifies as such an order. See In re San Angelo Pro Hockey Club, Inc., 292 B.R. 118, 124 (Bankr. N.D. Tex. 2003) ("The automatic stay is a self-executing injunction, and therefore, for contempt purposes, constitutes an order issuing from the bankruptcy court.")(citations omitted). The

---

[6]/It is not clear from the amended complaint under what legal basis Empresas Martínez asserts the related counts. That said, the plaintiff did not include any grounds for relief other than section 105(a) in its amended complaint or post-trial brief. (Adv. Dkt. Nos. 218 & 311.) Therefore, the court will consider those counts only under section 105(a) and will address them below.

16

violation must be "willful," meaning that the defendant "knew of the automatic stay and that the defendant's actions which violated the stay were intentional." Havelock v. Taxel (In re Pace), 67 F.3d 187, 191 (9th Cir. 1995). Unlike under section 362(k)(1), the court has discretion in awarding damages for a violation of stay under section 105(a). See A&J Auto Sales v. United States (In re A&J Auto Sales), 210 B.R. 667, 671 (Bankr. D.N.H. 1997).

At the outset, the court notes that while the parties focused during the trial on PC Puerto Rico's closure of the supermarket on August 4, 2011, this actually took place pre-petition: Empresas Martínez filed for bankruptcy more than two weeks later, on August 19, 2011. (Bankr. Dkt. No. 1.) Of course, it follows then that the closing of the supermarket did not violate the automatic stay, since the debtor was not yet under the stay's protection. That said, PC Puerto Rico's refusal to return the supermarket to the debtor after the petition was filed would constitute a violation of the stay, allowing the debtor to recover for the supermarket's lost income from the date the petition was filed to the sale of the property in June 2014, unless PC Puerto Rico demonstrates that it was acting within its rights as a lessee/sublessor. The court thus begins its analysis by interpreting the 2001 lease, and, by extension, the 2009 sublease, before turning to the straightforward matter of the disposal of the supermarket equipment and inventory.

Empresas Martínez contends that the 2001 lease, which was unaltered by the debtor's purchase of the property in 2006, covered only the gasoline service station, and that nothing in the lease agreement gave PC Puerto Rico any right to possess or exercise control over other areas of the property, including the supermarket. (Adv. Dkt. No. 311 at pp. 30-34.) Specifically, the debtor argues that the language of the 2001 lease was ambiguous as to

17

whether it covered the entire property, but that the parties' long-time custom and practice made clear that the lease applied only to the station.  Id.  And, that PC Puerto Rico took advantage of a preliminary injunction entered in the district court litigation, as a pretense, to "knowingly expand[] the scope of its leasehold interest to include the entire parcel of land," thus violating section 362(a)(3).  (Amended Cmplt., Adv. Dkt. No. 218 at ¶ 54.)  As a result, Empresas Martínez suffered significant damages and was unable to continue with the supermarket business.

PC Puerto Rico maintains that the 2001 lease encompassed the entire property, not just the gasoline service station, and that by closing the supermarket, which it considered just a gas station convenience store, it was simply exercising its rights as the lessor under the sublease agreement.  (Adv. Dkt. No. 315 at pp. 46-54.)  Even if the 2001 lease did not cover the whole property, PC Puerto Rico argues that it substantially complied with the automatic stay, but that it would have been impossible to be in full compliance since the cashier booth, which was part of the station, shared the same physical space as the supermarket.  (Adv. Dkt. No. 315 at pp. 31-36.)  PC Puerto Rico also contends that Empresas Martínez, through its president Mr. Martínez, should be precluded from recovering damages since it failed to mitigate damages.  (Adv. Dkt. No. 315 at pp. 61-65.)  Regardless, PC Puerto Rico asserts that it did not possess the bad faith necessary for the court to impose damages, since it was merely complying with orders entered in the district court case.  (Adv. Dkt. No. 315 at pp. 36-39.)

The court begins by examining the terms of the 2001 lease.  The 2001 lease provides in pertinent part that:

> THE LESSORS hereby lease to the LESSEE the property described above, but more specifically the area devoted to the gasoline service station included in the

18

property described in the first paragraph above, with all the appurtenances and all the rights, titles and interest of THE LESSORS, including the corresponding access roads. As long as the rest of the property remains undivided, this lease affects the entire property. . . .

(Joint Ex. I, Adv. Dkt. No. 270-31 at p. 36.) At the summary judgment stage, this court focused on the apparent contradiction between the "but more specifically" clause and the last sentence of the provision, stating:

> This language is subject to at least two interpretations. One, that the entire real property as recorded in the registry of the property is the subject of the lease. The other, that only the area devoted to the gasoline service station is covered by the lease. Thus, the terms of the contract are unclear, leave doubt as to the intention of the contracting parties, and are contradictory. And, pursuant to Article 1233 of the Civil Code of Puerto Rico, the court is required to look to the intention of the contracting parties. . . .
> Also, pursuant to Article 1234 of the Civil Code of Puerto Rico, "in order to judge as to the intention of the contracting parties, attention must principally be paid to their acts, contemporaneous and subsequent to the contract." P.R. Laws Ann. tit. 31, § 3472.

(Adv. Dkt. No. 176.) During the trial, the court heard testimony from Mr. Faure stating that it was the company's practice to only negotiate leases for an entire property, since that was required to register a first lien on the property. (Adv. Dkt. No. 312-6 at p. 21, p. 21 at ln. 20 to ln. 24.) Mr. Faure also explained that it was the company's practice to include the "but more specifically" clause in the lease so that the lease would follow the portion of the property containing the station in the event that the property was later segregated, such as through an eminent domain proceeding.[7] (Adv. Dkt. No. 312-6 at pp. 22-23, p. 22 ln. 6 to p. 23 ln. 14.) However, while this testimony may explain PC Puerto Rico's general practice, the court finds

---

[7] It is uncontested that the property was never segregated during the time in question.

19

PC Puerto Rico's actions "contemporaneous and subsequent to the contract" with regard to this particular station to be more telling.

While PC Puerto Rico attempts to characterize the supermarket as simply a service station convenience store that Mr. Martínez was authorized to run under the sublease agreement to help draw more traffic to the station, the Court is not persuaded. As Ms. Berríos admitted at trial, and as was quite apparent from Mr. Martínez' testimony and the evidence submitted at trial, the size and scope of the market grew so substantially that it well exceeded that of a gasoline service station convenience store. (Adv. Dkt. No. 314-6 at p. 35, p. 101 ln. 7 to ln. 16; Adv. Dkt. No. 314-6 at p. 38, p. 104 ln. 14 to 19; Pl. Exs. I - M, Adv. Dkt. Nos. 270-11 to 270-15; Pl. Ex. B, Adv. Dkt. Nos. 270-7 & 270-8; Pl. Ex. C, Adv. Dkt. Nos. 270-9 & 270-10.) Also, if the supermarket fell under the sublease agreement, Mr. Martínez would have needed to obtain prior written consent from PC Puerto Rico to conduct any renovations or modifications to the property, or to add any outside signage. (Joint Ex. III, Adv. Dkt. No. 270-25 at pp. 35-36.) There is no evidence that Mr. Martínez ever sought permission from PC Puerto Rico for any of the changes to the market, nor that PC Puerto Rico ever complained of that fact despite being aware that the renovations were taking place. (Adv. Dkt. No. 314-6 at p. 35, p. 101 at ln. 7 to ln. 16.)

Furthermore, Ms. Berríos' testimony made clear that PC Puerto Rico treated the other businesses on the property, including both the supermarket and the third party rental spaces, as separate from the gasoline service station. For example, PC Puerto Rico did not collect rent from any of those businesses. (Adv. Dkt. No. 314-6 at p. 41, p. 107 at ln. 19 to ln. 22; Adv. Dkt. No. 314-6 at p. 38, p. 104 at ln. 2 to ln. 5.). The supermarket also had a separate cash register

20

and entrance. (Adv. Dkt. No. 314-1 at p. 65-67, p. 66 at ln. 18 to p. 68 at ln. 12.) Based on the record, the court finds that the parties' actions illustrate that PC Puerto Rico did not consider the area of the property on which the supermarket was subsequently built to be part of the 2001 lease. Therefore, PC Puerto Rico's holdover of the supermarket after Empresas Martínez filed for bankruptcy was an "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

The court next turns to the issue of willfulness. PC Puerto Rico argues that even if it violated the stay, its actions were not "willful" because it believed, in good faith, that the 2001 lease covered the entire property, and that orders entered in the district court case supported its position. PC Puerto Rico relies primarily on A&J Auto Sales v. United States (In re A&J Auto Sales), 210 B.R. 667 (Bankr. D.N.H. 1997), in arguing that there is a "bad faith" requirement for a violation-of-stay action brought by a corporate debtor under section 105(a). In that case, the bankruptcy court declined to award a corporate debtor damages under section 105(a) despite finding that the IRS had actual knowledge of the stay and had willfully violated it. A&J Auto Sales, 210 B.R. at 671. The court cited as its rationale that the IRS's removal of the vehicles in question had been done in good faith, that the actions taken were in accordance with the IRS policy guidelines, and that there were no real damages, other than some minor damages to two vehicles from towing and several car batteries. Id. This appears to be simply a matter of a court exercising its discretion in a case where a debtor suffered no significant damages rather than the adoption of a hard-and-fast rule.

In any event, this court will follow the same course of action here. Contrary to the more cut-and-dried analysis concerning the disposal of the supermarket equipment and inventory,

the court acknowledges that the wording of the 2001 lease could have led PC Puerto Rico to believe–incorrectly, but in good faith–that it was not violating the stay by continuing to exercise control over the supermarket after the debtor filed for bankruptcy. See In re San Angelo Pro Hockey Club, Inc., 292 B.R. 118, 125 (Bankr. N.D. Tex. 2003) ("willfulness issue becomes more problematic where there is a legal uncertainty whether the stay applies or not to the creditor's conduct."). In light of the circumstances, the court, in its discretion, elects not to award damages for contempt corresponding to PC Puerto Rico's failure to return the supermarket to the debtor after receiving notice that Empresas Martínez had filed for bankruptcy. See A&J Auto Sales, 210 B.R. at 671. That being said, as will be discussed below, the court also finds that the debtor has failed to meet its burden of sufficiently quantifying the supermarket's lost income up until the sale of the property and would therefore not be awarded any damages for this count anyway.

Turning to the issue of PC Puerto Rico's disposal of the supermarket equipment and inventory, the court finds that these actions constituted a violation of the automatic stay. Following the expiration of the district court's September 27, 2011 deadline, PC Puerto Rico hired a maintenance company to destroy the remaining equipment and inventory left in the supermarket. The items, however, were property of the debtor (see Bankr. Dkt. Nos. 1 & 27), and their destruction was therefore an act "to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). See In re Calloway, 2016 Bankr. LEXIS 3678, at *2 (Bankr. D.D.C. Oct. 11, 2016) ("The debtor's loss of his right to possess the rented premises did not divest the debtor of ownership of the items of personal property stored in the premises. The destruction of the

debtor's personal property was plainly an act 'to exercise control over property of the estate' within the meaning of § 362(a)(3).").

PC Puerto Rico does not contest that it received timely notice of Empresas Martínez' bankruptcy filing. Indeed, Chevron Puerto Rico LLC, which later became PC Puerto Rico, was included on the creditor matrix filed with the petition and first appeared in the case on August 23, 2011, well before the supermarket equipment and inventory were destroyed. (Bankr. Dkt. Nos. 1 & 6.) Nor is there a dispute that PC Puerto Rico hired the maintenance company.

Instead, PC Puerto Rico maintains that it was authorized to destroy the equipment and inventory by the order entered by the district court setting the September 27th deadline. However, the uncertainty regarding the scope of the 2001 lease does not factor into the analysis here. Regardless of whether the 2001 lease includes the area on which the supermarket was built or not, the equipment and inventory are property of the debtor and thus protected by the automatic stay. (See Bankr. Dkt. Nos. 1 & 27); Calloway, 2016 Bankr. LEXIS 3678 at *2. The fact that the district court entered a post-petition order apparently authorizing their disposal does not change this, since "[i]t is well settled in the First Circuit that actions taken in violation of the automatic stay are void and without legal effect," including the entering of court orders. Peoples Heritage Bank, N.A. v. Hart (in Re Hart), 282 B.R. 70, 77 (B.A.P. 1st Cir. 2002) (finding state court judgment filed a month after the debtor filed for bankruptcy to be void). The court notes that it is not entirely clear from the record in this case to what extent the district court was informed that Empresas Martínez, not Mr. Martínez, was the owner of the inventory and equipment, or about PC Puerto Rico's history of treating the supermarket and third party spaces as separate businesses from the gasoline service station.

Furthermore, while PC Puerto Rico argues that debtor's president, Mr. Martínez, was responsible for the losses since he failed to move all of the items prior to the deadline, the court finds that Mr. Martínez did make reasonable efforts to remove the equipment and inventory prior to the deadline, but that he was unable to comply fully at least in part because of extenuating circumstances. In any event, as the court just stated, that district court order was in violation of the stay and therefore void. Peoples Heritage Bank, 282 B.R. at 77.

Finally, the court points out as a practical matter that there did not appear to be a pressing need for PC Puerto Rico to dispose of the equipment and inventory, and to do so in such an irrevocable manner. Based on Mr. Martínez' testimony, the supermarket and gasoline service booth had co-existed in the same space for some time. In fact, Mr. Martínez demonstrated at trial that a gypsum wall could easily have been erected separating the cashier booth from the market at a relatively minor cost of approximately $1,750.00. (Adv. Dkt. No. 314-3 at pp. 7-11, p. 8 at ln. 4 to p. 12 at ln.17; Pl. Ex. O, Adv. Dkt. No. 270-17; Adv. Dkt. No. 315 at pp. 31-36.) Even without the wall, the supermarket equipment could have been left where it was without interfering with the operation of the gas station in any significant way. Given the value of the equipment and inventory, and knowing that Empresas Martínez had filed for bankruptcy the prior month, PC Puerto Rico accepted the risk of incurring liability by not first obtaining an order from this court lifting the automatic stay prior to destroying the items. See In re Mu'min, 374 B.R. 149, 168 (Bankr. E.D. Pa. 2007) ( "[s]trong policy reasons exist to put the burden on a creditor to bring automatic stay issues to the bankruptcy court (rather than permitting the creditor to act unilaterally, thereby compelling the debtor to seek judicial redress to enforce the stay or undo collection action)".).

24

In view of the above, the court finds PC Puerto Rico liable under section 105(a) for violation of the automatic stay for the destruction of the supermarket equipment and inventory.[8] As to the related counts, the court will address the matter of the supermarket's lost income in the section on damages. As to the other count, for loss of future income/loss of a value as a going concern, the same is moot. There is no future income; the real property was sold to a third party in June 2014, prior to the filing of the amended complaint, and the debtor's request for loss of income covered the period from the filing of the bankruptcy up until June 2014. Furthermore, the debtor abandoned its claim for loss of value as a going concern by not submitting any evidence at trial to establish that claim.[9]

**V. Damages.**

Having found that PC Puerto Rico violated the automatic stay by disposing of the supermarket equipment and inventory, the court turns to the issue of damages. Courts have held that a corporate debtor that suffers a violation of stay may be entitled to compensatory damages sufficient to place "the injured party in as good a position as it would have been" in the absence of a violation. In re 1601 W. Sunnyside #106, LLC, 2010 Bankr. LEXIS 4903, at *17 (Bankr. D. Idaho Dec. 30, 2010). Attorney fees may also be awarded. See Rediger Invs. Corp. v. H Granados Communs., Inc. (In re H Granados Communs., Inc.), 503 B.R. 726, 736 (B.A.P. 9th

---

[8] For the same reasons, and taking into consideration the parties' briefs at docket numbers 291, 299, and 301, the court denies PC Puerto Rico's motion to reconsider the denial of its request for judgment as a matter of law under Rule 52(c), made applicable under Bankruptcy Rule 7052.

[9] For the sake of completeness, to the extent the debtor intended to bring the related counts under a different legal theory, such as under Puerto Rico law, it failed to provide the relevant points and authorities to support any relief. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). As such, it also abandoned any claims under Puerto Rico in the related counts.

Cir. 2013) (affirming bankruptcy court's awarding of attorney fees as compensatory damages in a violation of stay proceeding brought by a corporate debtor under section 105(a), stating that "attorneys' fees [incurred in litigating the violation of stay claim] are an appropriate component of civil contempt sanctions"). The amended complaint does not appear to request punitive damages, nor has the Court of Appeals for the First Circuit definitively stated that such a remedy is permitted in this jurisdiction. But see In re Sayeh, 445 B.R. 19, 29 (Bankr. D. Mass. 2011) (noting that the First Circuit, in dicta, appears to have voiced support for such a remedy) (citing Bessette v. Avco Fin. Servs., 230 F.3d 439 (1st Cir. 2000)). In any event, to the extent punitive damages may be awarded to a corporate debtor in a violation of stay claim under section 105(a), the court does not find such relief warranted in this case.

Apart from attorney fees, the damages sought in this case are comprised of the loss of the supermarket equipment, the loss of supermarket inventory, and the loss of the supermarket's income up until the sale of the property in June 2014.[10] (Amended Cmplt., Adv. Dkt. No. 218 at ¶ 74.) To prove its damages claims, Empresas Martínez called Mr. Avilés as an expert witness on the issue of economic damages and lost earnings. PC Puerto Rico elected not to call an expert of its own. It did, however, attempt to strike the expert's testimony.

Motion to Strike Expert Testimony

At the conclusion of the expert witness's testimony, PC Puerto Rico moved the court to strike the testimony in its entirety, arguing that the expert had not supplemented his report

---

[10]/The amended complaint originally also sought damages for the loss of the metal shop equipment. (Amended Cmplt., Adv. Dkt. No. 218 at ¶ 74.) This was subsequently struck from the amended complaint once the plaintiff informed the court that the equipment had been returned to the debtor. (Adv. Dkt. Nos. 210 & 212.)

26

as required under Rule 26(e)(2), had not complied with Rule 26(a)(2)(B), and had asserted conclusions that were based on an unreliable methodology and lacked a reliable foundation, under FRE 702 and 703.  (Adv. Dkt. No. 312-5 at pp. 57-58, p. 57 at ln. 24 to p. 58 at ln. 11.)  The court denied the request, just as it had a prior motion based largely on the same grounds filed before trial.  (Adv. Dkt. Nos. 116 & 240.)  However, the court acknowledged that some of the issues raised by PC Puerto Rico would factor into how much weight the court would ultimately give to the expert's testimony.  (Adv. Dkt. No. 312-5 at pp. 72-73, p. 72 at ln. 24 to p. 73 at ln. 8.)  On the final day of trial, PC Puerto Rico moved the court to reconsider its prior ruling.  (Adv. Dkt. No. 312-6 at pp. 73-74, p. 73 at ln. 24 to p. 74 at ln. 19.)  The court granted both parties an opportunity to address the issue by motion, which they did.  (Adv. Dkt. Nos. 290 & 298.) PC Puerto Rico then requested leave to file a reply, which the court granted.  (Adv. Dkt. No. 300.)

After considering the parties' arguments, the court denies PC Puerto Rico's motion for reconsideration under Rule 60(b)(1).  As to Rule 26(a)(2)(B), it is true that the expert did not comply with all of the disclosure requirements, as his report did not include a list of other cases in which he had testified (none) or state the compensation he would receive.  (Pl. Ex. X, Adv. Dkt. No. 282-2.)  Likewise, regarding Rule 26(e)(2), the expert did not update the report to reflect the sale of the real property in 2014, or to correct a relatively minor error in his calculations.  Id.  However, it is not contested that PC Puerto Rico was aware of the sale of the property well before trial, and the calculation error, in the amount of $3,000.00, was actually to the benefit of PC Puerto Rico.  The court finds these errors to be harmless and do not merit

striking the report.  See Fed. R. Civ. P. 37(c)(1) (made applicable to these proceedings by Fed. R. Bankr. P. 7037).

As to the defendant's arguments under FRE 702 and 703, the admissibility of expert testimony requires:

> First, the court must decide whether expert testimony could assist the trier of fact in understanding the evidence or determining a fact in issue. The court may be required as an aspect of this inquiry to determine whether a sufficiently reliable body of scientific, technical, or other specialized knowledge has been developed. Second, the court must also determine whether the witness called is properly qualified to give the testimony sought. The witness may be qualified as an expert on the bases of either knowledge, skill, experience or education or a combination thereof. Morganroth & Morganroth v. DeLorean, 213 F.3d 1301 (10th Cir. 2000) (Expert opinion evidence in affidavit form could properly be considered on motion for summary judgment); In re Moyer, 421 B.R. 587 (Bkrtcy. S.D. Ga. 2007).

Barry Russell, Bankr. Evid. Manual § 702:1 (2014 ed.).  Here, the court finds that the expert meets these requirements, as he possesses the requisite "knowledge, skill, experience or education" to employ standard accounting principles to calculate a corporation's lost earnings, a relatively straightforward task, and his testimony assisted the court in understanding the facts at issue.  See Palmacci v. Umpierrez, 121 F.3d 781, 792 (1st Cir. 1997) ("A trial court has wide discretion in determining the admissibility of expert testimony, especially where the issue is being tried directly to the bench.").  That being said, the expert's testimony opinion is not binding on the court, and the court as the trier in fact is free to determine what weight ultimately to give Mr. Avilés' testimony.  Brandt v. nVidia Corp. (In re 3dfx Interactive, Inc.), 389 B.R. 842, 868 (Bankr. N.D. Cal. 2008)("The court may decline to accept an expert's opinion, in whole or in part, and may reject an expert's opinion based upon its conclusions regarding the expert's credibility. . . . Even uncontradicted expert testimony is not necessarily

28

conclusive."); see Bankr. Evid. Manual at § 702:2.  In light of this, the court denies PC Puerto Rico's motion for reconsideration of the order denying its motion to strike the expert report at docket number 290.

In his report, plaintiff's expert valued the supermarket equipment at $75,000.00, the supermarket inventory at $333,153.00, and the supermarket's lost income at $1,152,123.00. (Pl. Ex. X, Adv. Dkt. No. 282-2 at p. 6.)  At trial, the expert amended the lost income figure downward–to $1,149,123.00–citing a clerical error in his report.  (Adv. Dkt. No. 312-4 at pp. 88-89, p. 88 at ln. 8 to p. 89 at ln. 18; Pl. Ex. X, Adv. Dkt. No. 282-2 at p. 9.)

As to the loss of supermarket equipment, the court accepts the expert's $75,000.00 valuation.   Mr. Martínez, in his testimony, estimated the equipment's value to be approximately $150,000.00 (Adv. Dkt. No. 314-3 at p. 46, p. 45 at ln. 16 to ln. 23), but the court finds the expert's opinion, which was derived from tax returns and financial statements, to be more credible.  (Adv. Dkt. No. 312-4 at p. 114,  p. 114 at ln. 15 to ln. 23.)  The court also notes that plaintiff's amended complaint lists the value of the lost equipment to be approximately $75,000.00.   (Amended Cmplt., Adv. Dkt. No. 218 at ¶ 74.)

Regarding the loss of supermarket inventory, the court also accepts the expert's figure of $333,153.00, which was derived from "data provided by the auditors for the year 2011."[11]

---

[11]/During trial, the court admitted as an exhibit under the business records exception to the hearsay rule two inventory records for the supermarket, one dated January 13, 2010, and the other undated. (Pl. Ex. S, Adv. Dkt. No. 270-22.)  PC Puerto Rico later moved orally for the court to reconsider the exhibit's admission, arguing that the records did not meet the requirements for the exception.  (Adv. Dkt. No. 312-4 at pp. 5-6, p. 5 at ln. 23 to p. 6. at ln. 6.) The court gave both parties the opportunity to submit further briefs on the issue.  (Adv. Dkt. Nos. 282, 284 & 295.)

As the court stated at the time, it considers the exhibit to have minimal probative value in determining the value of the lost inventory.  There is simply no way of determining how representative the two inventories are of what the market was carrying in August 2011.  One of the inventory records

(Adv. Dkt. No. 312-4 at p. 114, p. 114 at ln. 7 to ln. 14.) This number is also supported by Mr. Martínez' testimony, who estimated the value of the lost inventory to be $300,000.00. (Adv. Dkt. No. 314-3 at p. 44, p. 43 at ln. 18 to ln. 22.) The court finds this estimate to be credible, noting that Mr. Martínez was able to list in great detail the items for sale in the market, as well as their placement within the store at various times.

Concerning the supermarket's lost income, however, the court declines to adopt the expert's conclusion, finding it to be unsupported by the factual record. Mr. Avilés testified that he calculated the lost income by first computing the supermarket's annual projected gross sales from August 2011, when the supermarket was shut down, until April 2014.[12] (Adv. Dkt. No. 312-4 at pp. 91-92, p. 91 at ln. 9 to p. 92 at ln. 4.) The annual sales projections are based, in turn, on weekly projections, beginning at $130,000.00 in 2011 and rising to $175,000.00 by April 2014. (Pl. Ex. X, Adv. Dkt. No. 282-2 at pp. 9-10.) From this, he then subtracted the

---

is undated, while the other is from January 2010, more than 18 months prior to when the supermarket was shut down. Furthermore, while the inventories were included among the expert's working papers (Pl. Ex. Z, Adv. Dkt. No. 282-4 at pp. 13-14), it is not clear to what extent, if any, the expert relied on them. In his report, the expert determined the supermarket inventory loss to be $333,153.00. (Pl. Ex. X, Adv. Dkt. No. 282-2.) This figure was calculated by taking the initial inventory listed in the Sabana Grande Texaco, Inc. Income Statement of $167,008.65, adding the "mini market purchases" in the amount of $216,144.05, and then subtracting a final inventory adjustment in the amount of $50,000.00. (Pl. Ex. Z, Adv. Dkt No. 282-4 at p. 12.) Neither the initial inventory entry nor the amount listed for "mini market purchases" match the amounts included on the inventory record. (Pl. Ex. Z, Adv. Dkt. No. 282-4 at pp. 13-14). In any event, for the sake of completeness, the court grants PC Puerto Rico's oral request to reconsider the admission of Exhibit S.

Also of note, the court is satisfied with the expert's explanation as to why the income statement was listed under the name of an entity other than the debtor. Mr. Avilés stated, and the court finds credible, that it is common bookkeeping practice not to change the heading on the file following a merger or consolidation. (Adv. Dkt. No. 312-5 at pp. 32-34, p. 32 at ln. 25 to p. 34 at ln. 19.) So, after Sabana Grande Texaco, Inc. turned over operations of the supermarket to the debtor in 2010, the name was still used on internal accounting documents. Id.

[12]/It is not entirely clear why Mr. Avilés chose April 2014 rather than June 2014, which is when the real property was sold.

30

projected cost of sales, which presumably includes the inventory, as well as various administrative expenses. (Pl. Ex. X, Adv. Dkt. No. 282-2 at pp. 9-11.)

The problem is that the projected sales figures are based on a flawed presumption. Mr. Avilés testified that he calculated the weekly sales numbers by looking at the 2009 audited statement, which showed weekly sales of approximately $45,000.00. (Adv. Dkt. No. 312-4 at pp. 95-96, p. 95 at ln. 22 to p. 96 at ln. 7.) He stated that Mr. Martínez had told Mr. Avilés that the supermarket was operating at only 30% of its capacity, and so Mr. Avilés simply extrapolated from this to calculate projected sales as if the supermarket were operating at 100% capacity, or roughly 7,000 square feet. (Adv. Dkt. No. 312-4 at p. 96, p. 96 at ln. 8 to ln. 10.) But, as stated above, Mr. Martínez testified that the supermarket never operated at more than 2,400 to 2,500 square feet, and the plaintiff failed to submit evidence showing that it would be able to operate at full capacity, and, if so, when that would happen.

Neither is it a matter of simply reducing the lost income to 30% of the expert's calculations. The projected lost income is based on three factors: projected gross sales, projected cost of sales, and administrative expenses. (Pl. Ex. X, Adv. Dkt. No. 282-2 at p. 9.) It is not at all clear from the record that the projected cost of sales could simply be proportionately reduced, nor likewise how this would affect the projected yearly administrative expenses. Those costs are listed in the report in a conclusory fashion, and there is insufficient documentary and testimonial evidence that would allow the court to make such a determination.

Further, the court is not persuaded by Mr. Avilés' efforts to bolster the validity of his calculations by showing how his own conclusions match the sales per square foot of two of the

31

largest supermarket chains in Puerto Rico, Selectos and Econo. The court is just not convinced that this is an appropriate comparison.[13] Per his own testimony, those chains have average in-store annual sales of approximately $22 million with an average store size of 20,000 square feet, dwarfing the debtor's supermarket in both measures. (Adv. Dkt. No. 312-4 at pp. 96-97, p. 96 at ln. 23 to p. 97 at ln. 2.) Also, they likely benefit from economies of scale and logistical and marketing advantages that a stand-alone supermarket in a gas station does not enjoy.

Ultimately, any attempt to quantify the plaintiff's damages due to the supermarket's lost income would require the court to speculate, which it cannot do. Heghmann v. Indorf (In re Heghmann), 316 B.R. 395, 405 (B.A.P. 1st Cir. 2004) ("A damages award cannot be based on mere speculation, guess or conjecture.") (citation omitted). The court does not doubt that plaintiff suffered damages in this regard, but the court does not accept the expert's analysis on this issue and is thus unable to quantify the damages. Accordingly, even if the court had found that PC Puerto Rico violated the stay by holding over the supermarket, the plaintiff would not have been awarded no damages for lost income because it failed to carry its burden of proof as to those damages.

**VI. Conclusion.**

In view of the above, the court finds the defendant PC Puerto Rico liable under section 105(a) of willfully violating the automatic stay of the corporate debtor, Empresas Martínez, by disposing of the supermarket equipment and inventory. The court imposes compensatory

---

[13]/While Mr. Avilés stated during his testimony that one reason he compared sales numbers with Selectos was because he was informed that Selectos was in negotiations to run the supermarket, the court sustained PC Puerto Rico's objection to this line of testimony on hearsay and relevance grounds. (Adv. Dkt. No. 312-4 at p. 100, p. 100 at ln. 8 to p. 103 at ln. 19.)

32

damages in the amount of $75,000.00 corresponding to lost equipment and $333,153.00 corresponding to lost inventory, for a total amount of $408,153.00. No liability is imposed for holding over the supermarket and no damages are awarded for lost income. As to the count for loss of future income/loss of value as a going concern, the court finds the first part to be moot since the property was sold prior to the filing of the amended complaint and the second part to be abandoned by the plaintiff. Also, to the extent the plaintiff intended to seek relief under a legal theory other than under section 105(a), the court finds that the plaintiff abandoned any request for relief under Puerto Rico law for failure to provide supporting points and authorities.

In addition, the plaintiff is entitled to attorney fees. The plaintiff is granted sixty (60) days to submit, under the lodestar method, a statement of attorney fees and costs incurred in the prosecution of this adversary proceeding. The defendant is granted twenty-one (21) days after the fee statement is filed to submit any objection. Final judgment will be entered upon the resolution of this last matter.

SO ORDERED.

In Ponce, Puerto Rico, this 4th day of April, 2017.

Edward A. Godoy
U.S. Bankruptcy Judge